UNITED STATES of America, Plaintiff-Appellee,

v.

James Glenn CHASTAIN, Larry Gene Hopkins, et al., Defendants-Appellants.

No. 97-5208.

United States Court of Appeals,

Eleventh Circuit.

Dec. 30, 1999.

Before BIRCH and MARCUS, Circuit Judges, and ALAIMO[*], Senior District Judge.(No. 96-14035-CR-JCP), James C. Paine, Judge.

ALAIMO, Senior District Judge:

Appellants, James Glen Chastain, Larry Gene Hopkins, Clyde Morris, and Edwin Berle Rucks, Jr., appeal the jury verdict and the district court's subsequent sentencing for various narcotic offenses in connection with the attempted importation of marijuana into the United States. The jury found the Appellants and one additional co-defendant[1] guilty of all the crimes charged in the five-count indictment. The counts were as follows: Count I charged all four Appellants and co-defendant Beatty with conspiracy to import marijuana in violation of 21 U.S.C. §§ 952(a)[2] and 963[3]; Count II charged all four Appellants and Beatty with

---

[*]Honorable Anthony A. Alaimo, Senior U.S. District Court Judge for the Southern District of Georgia, sitting by designation.

[1]Co-Defendant William Arthur Beatty Jr. has not appealed his guilty verdict.

[2]Section 952(a) states:

> It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter, or any narcotic drug in schedule III, IV, or V of subchapter I of this chapter....

[3]Section 963 states:

> Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

conspiracy to possess intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1)[4] and 846[5];  Count

III charged Appellants Chastain and Hopkins and their co-defendant Beatty with attempt to import marijuana

in violation of 21 U.S.C. §§ 952(a) and 963 and 18 U.S.C. § 2[6];  Count IV charged Appellants Chastain and

Hopkins and co-defendant Beatty with attempt to possess marijuana with intent to distribute in violation of

21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;  and Count V charged Appellant Chastain and co-defendant Beatty

with knowingly displaying false and misleading marks on a federally registered aircraft with the intent to

conspire to import marijuana into the United States in violation of 21 U.S.C. § 963, 49 U.S.C. § 46306(c)(2)

and (c)(3)[7] and 18 U.S.C. § 2.

---

[4]Section 841(a)(1) states:

> Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;

[5]Section 846 states:

> Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

[6]Section 2 states:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal;  (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

[7]Section 46306(c)(2) and (c)(3) states:

> (c) Controlled substance criminal penalty.
>
> (2) A person violating subsection (b) of this section shall be fined under title 18, imprisoned for not more than 5 years, or both, if the violation is related to transporting a controlled substance by aircraft or aiding or facilitating a controlled substance violation and the transporting, aiding, or facilitating—
>
> (A) is punishable by death or imprisonment of more than one year under a law of the United States or a State;  or
>
> (B) that is provided is related to an act punishable by death or imprisonment for more than one year under a law of the United States or a State related to a controlled substance (except a law related to simple possession of a controlled substance).

On March 26, 1997, the jury returned a verdict finding Chastain guilty as to Counts I-V; Hopkins guilty as to Counts I-IV; and Morris and Rucks guilty as to Counts I and II. All of the Appellants were sentenced by the district court and are presently incarcerated.[8]

Each Appellant appeals several aspects of his trial, conviction, and/or sentence. Appellants present a total of eight different issues for the Court's consideration: (1) whether the district court properly exercised its discretion in denying defense counsel's request to question potential jurors during voir dire about fundamentals of the criminal justice system; (2) whether the district court properly denied Appellants' motion for a mistrial based on the government's violation of F.R.C.P. Rule 16, and whether the district court properly exercised its discretion in allowing a United States Customs Service agent to testify as an expert on drug smuggling; (3) whether Appellants were entitled to judgment of acquittal (or reversal of their convictions) due to an alleged variance between the charges in the indictment and the government's proof at trial; (4) whether there was sufficient evidence to support the convictions of the four Appellants; (5) whether the district court abused its discretion by refusing to give a multiple conspiracy instruction, and a theory of defense instruction proffered by Appellant Morris; (6) whether the district court properly exercised its discretion in denying defense counsel's motion for a mistrial based upon a government witness' answer to a question on cross-examination, and whether the district court properly exercised its discretion in denying Morris' motion for a mistrial based upon the government's attempt to question him about a prior conviction on tax evasion; (7) whether Appellant Rucks was entitled to dismissal of the indictment or a new trial based

---

(3) A term of imprisonment imposed under paragraph (2) of this subsection shall be served in addition to, and not concurrently with, any other term of imprisonment imposed on the individual.

[8]The district court sentenced the Appellants as follows: Chastain received concurrent terms of 97 months' imprisonment as to Counts I-IV, two years' probation as to Count V, four years' supervised release and a $350 special assessment; Hopkins received concurrent terms of 87 months' imprisonment as to Counts I-IV, five years' supervised release and a $300 special assessment; Morris received concurrent terms of 78 months' imprisonment as to Counts I and II, four years' supervised release and a $200 special assessment; and, Rucks received concurrent terms of 78 months' imprisonment as to Counts I and II, four years' supervised release and a $200 special assessment.

upon his claim of outrageous governmental misconduct; and (8) whether the district court properly applied the sentencing guidelines in sentencing Appellants Chastain, Hopkins and Rucks.

With respect to the first seven issues, we have examined the record and we affirm the district court's decisions on those issues for the reasons discussed in this opinion. However, with respect to the final issue involving the application of Federal Sentencing Guideline § 2D1.1(b)(2), we will reverse and remand.

*BACKGROUND*

The evidence adduced during the trial discloses that the government first became aware of this conspiracy on February 1, 1996, when an airplane, co-piloted by Appellant Chastain and Co-Defendant Beatty, slid off the runway and crashed at the Placid Lakes Airport in Highlands County, Florida. The plane was carrying several plastic containers of aviation fuel, an illegal fuel transfer system, burlap bags, duct tape, an aircraft global positioning system, a hand-held radio, and aeronautical maps and charts for air travel between Jamaica and Florida. Furthermore, all passenger seats had been removed.

When Highlands County Sheriff's Deputy Kevin Awbrey arrived at the scene, he saw Beatty standing next to the aircraft. Deputy Awbrey noticed that the aircraft's Federal Aviation Administration ("FAA") registration number had been altered with duct tape. He stepped away from the aircraft several times during the initial investigation, leaving Beatty alone, and later noticed that the duct tape used to alter the plane's FAA number had been removed.

Soon after the plane crash, a flight instructor saw a man walk from behind the newly constructed hangars and attempt to enter an old pick-up truck. The flight instructor later identified the young man as Appellant Chastain. The pick-up truck was locked and Chastain asked the flight instructor to help him locate the keys to the truck and the latter agreed to do so. The flight instructor asked Chastain whether he had been on the plane that had just crashed and Chastain answered affirmatively. At the crash site, the instructor found Beatty sitting on the plane's wing. He asked Beatty for the truck keys and returned to the area where he had left Chastain, but found that Chastain and the truck were gone. Broken glass lay on the ground where the driver's side of the truck had been.

Deputy Ouverson, the crime scene detective, arrived at the crash site and saw Beatty tearing up a business card. Ouverson recovered most of the card, pieced it back together, revealing a partial phone number. Officers subsequently obtained telephone records that indicated that someone from Beatty's home had called a telephone number in Jamaica on January 11, 1996, that was almost identical to the one on the business card that Beatty had destroyed.

A number of items found on the crashed place were owned by or connected to the four Appellants or Beatty. The hand-held radio that was found had been purchased on January 13, 1996 by Eugene Prince, Beatty's long-time casual acquaintance. The Magellan global positioning system found in the plane had been purchased by Beatty on January 16, 1996. Plastic fuel drums in the aircraft were similar to four fifteen gallon fuel drums that Appellant Rucks had obtained in late 1995, as well as three additional fuel drums that Appellant Morris had obtained from the same source in early 1996. On January 23, 1996, Beatty purchased 33.8 gallons of fuel from the Fort Pierce Air Center and ordered an overnight tie-down for an aircraft bearing the same registration number as the aircraft that Beatty and Chastain crashed on February 1, 1996.

In January of 1996, Appellant Hopkins attempted to borrow $50,000 from Lee Clardy in order to purchase an airplane. Hopkins told Clardy that the plane he wanted to buy with the borrowed money would be used to haul drugs and that Clardy would double his investment. Hopkins offered Clardy titles to vehicles and other property as collateral, but Clardy declined to make the loan.

A few days later, Hopkins was able to borrow $40,000 from George Godwin. As collateral, Godwin received title to a race car trailer, two pick-up trucks and a boat. On January 22, 1996, Hopkins purchased a Piper Cherokee aircraft from Lyle Travis for approximately $40,000. About one week later, Beatty and Chastain slid off the runway at Lake Placid Airport.

After the plane crash, Hopkins told Godwin that if anyone were to ask him about the property Godwin received as collateral for the loan, he should say that he had purchased the property from Hopkins. Hopkins also told Godwin that, if he were questioned in court about Hopkins' purchase of the plane, he should say that Hopkins had been interested in planes for years.

Clardy read about the crash in the newspaper and, later, on Godwin's property, saw some of the property that Hopkins had offered to him as collateral when he had declined to lend money to Hopkins. Clardy then informed local law enforcement officials about the offer Hopkins previously had made to him.

Three or four weeks after the crash, Morris and Rucks approached a confidential informant ("CI") for the United States Customs Service at Fort Drum Store, a local convenience store and restaurant. Rucks asked the CI whether he could obtain a plane and pilot to fly to Jamaica to pick up a load of marijuana waiting there. The CI answered that he could.

The next day, Rucks and Morris again met with the CI and inquired whether he had contacted a pilot. The CI said he had left a message for the pilot, but had not yet received a response. After this second meeting, the CI contacted Deputy Sheriff Larry Williams and informed him of his conversations with Morris and Rucks.

A few days later, Rucks approached the CI and asked him again whether he had made contact with a pilot. The CI said he had not, but added that the pilot would have to be paid $30,000. A week later, Rucks approached the CI for a fourth time and asked about the pilot. Two days later, Morris told the CI "he needed to get a hold of a pilot as soon as he could because they done lost $40,000 on an airplane that crashed in February, and that they had the pot on an airstrip waiting on them and they had to get it off before they lost it." Rucks then described to the CI a "buy back plan" whereby the Jamaicans were to sell half of the marijuana and then buy the other half from the CI and the pilot.

The next day the CI met with Rucks in front of the Fort Drum Store and Rucks again asked him whether he had made contact with the pilot but told him they were only able to come up with $10,000 for the pilot. The CI said he would discuss the matter with the pilot. The CI, however, had never contacted any pilot subsequent to his discussions with Morris and Rucks. Although the CI met with them at later times, they did not have any further discussions regarding transporting marijuana.

Agent Bateman, the U.S. Customs pilot with whom the CI had previously worked, contacted the CI to inquire whether there was any further information on the February 1 plane crash. The CI replied in detail

of the meetings he had had with Morris and Rucks. The CI agreed to help with the investigation of the February 1 accident and to act as a "go-between" between Agent Bateman and Morris and Rucks and to record all subsequent conversations.

On June 21, 1996, the CI met with Morris in the parking lot of the Fort Drum Store. During this taped conversation, the CI stated that he needed money and asked whether Morris could get anything started. Morris replied that he still needed a plane. The CI told Morris that he had a plane and a pilot, and was ready to go. At this time Morris talked at length about the February 1st crash, saying that only the pilot had been caught and charged merely with having an expired license and carrying an unsecured load.

The CI called Morris on June 25, 1996 to determine whether Morris had successfully contacted the Jamaicans. Morris had tried in vain to set up a deal but agreed to meet the CI the next day at the Fort Drum Store. Rucks showed up instead and reiterated that they were having difficulties contacting the Jamaicans.

On June 27, Morris told the CI they wanted to bring in 2,000 pounds of marijuana from Jamaica. On June 29, the CI met with Rucks on property belonging to Rucks' family that would be used as a landing strip for the plane. Rucks stated that the strip was about one-half mile long, but that modifications could be made to make it more amenable for landing a plane. Rucks insisted the strip was suitable and had been used previously to bring in a load.

Later that same day, the CI again met with Rucks at Rucks' family property with Agent Bateman, who was introduced as the pilot. Agent Bateman suggested modifications to the strip to facilitate the landing of the plane, instructed Rucks on the materials he would need, and stated that he also needed a relief pilot. Rucks replied that he already had obtained much of the materials that Bateman requested and that Chastain was willing to serve as the relief pilot, just as he did on the plane that crashed in February. Bateman told Rucks that July 5, 1996, would be a good day for him because it was a holiday weekend and he would have access to his employer's plane. Rucks provided Bateman with a detailed description of the landing strip in Kingston, Jamaica, showed him the general location of the landing strip on a map, and promised to provide

him the coordinates at a later date. On June 30, Rucks delivered a fuel pump to the CI, that he said had come from Beatty.

On July 3 the CI met with Rucks and Chastain. Rucks said that Beatty had yet to make contact with their suppliers in Jamaica but that Beatty would be in Jamaica when the deal "went down." Nothing happened over the July 4th weekend because Appellants were unable to contact their suppliers.

On July 8 Rucks and Chastain delivered fuel drums to the CI and Agent Bateman. All four men discussed possible pick-up dates, given an impending storm. Chastain agreed to serve as Bateman's co-pilot and both Rucks and Chastain said they would try to contact their sources in Jamaica. On this occasion, Chastain discussed Hopkins' involvement in the February 1 attempt, complaining that Hopkins had waited until the last minute to buy the plane and then bought the cheapest plane he could find. He also stated they were acting hastily and not making good decisions, as evidenced by their decision to send Hopkins to Jamaica.

Law enforcement officers arrested Appellants and co-defendant Beatty on July 9 and 10, 1996, before any flight was made to Jamaica to pick up the load of marijuana.

This appeal followed the trial, jury verdict, and subsequent sentencing of all four Appellants.

*DISCUSSION*

*Voir Dire*

Appellant Hopkins contends that the district court erred in not allowing defense counsel to pose additional questions to the prospective jurors following some comments made by a few potential jurors during the voir dire. Hopkins points to the statements of jurors, Elizabeth Murphy and Luba Snook as the source of the alleged contamination of the jury pool. Murphy stated that because her son was a police officer and a law student, she "might be prejudiced in some way" in favor of the government. Snook stated that in her opinion the criminal justice system was more solicitous of criminals than victims; she also made equivocal statements about her ability to be fair. She said that while she would try to be fair, "if they were caught red-handed doing something wrong, they're wrong. If my kid did something wrong and I see him do it, he's

wrong, and he's going to be punished for it." That having been stated, the prospective jurors, including Murphy and Snook, when questioned by the court, indicated they could follow the court's instructions at the end of the case as to the applicable law, even if they disagreed with it. The two prospective jurors who made these statements, however, were ultimately dismissed.

The conduct of a voir dire examination is upheld unless there is an abuse of discretion. *See United States v. Miller,* 758 F.2d 570, 572 (11th Cir.1985). "Where statements made by potential jurors at voir dire raises the specter of 'potential actual prejudice' on the part of the *remaining* panel members, 'specific and direct questioning is necessary to ferret out those jurors who would not be impartial.' " *United States v. Dennis,* 786 F.2d 1029, 1043-44 *reh'g granted and denied in part,* 804 F.2d 1208 (11th Cir.1986) (*quoting, United States v. Corey,* 625 F.2d 704, 707 (5th Cir.1980)*, cert. denied,* 450 U.S. 925, 101 S.Ct. 1377, 67 L.Ed.2d 354 (1981)) (emphasis added). However, statements by potential jurors that do not constitute "potential actual prejudice," do not "mandate additional voir dire." *Dennis,* 786 F.2d at 1044 (*quoting, United States v. Tegzes,* 715 F.2d 505, 508 (11th Cir.1983)).

Upon review of the record, it appears that the statements made by Murphy and Snook were somewhat common place and relatively innocuous. The women were simply raising their own doubts as to their ability to be fair. They did not express any opinion as to the guilt or innocence of Hopkins or the other Appellants. In sum, their statements did not relate to any facts of the case, or parties, or witnesses involved in the case. The effect of these statements is highly speculative in nature and Appellants did not show that they rise to the level of "potential actual prejudice," much less that the district court judge abused his discretion in refusing to allow defense counsel to ask specific jurors questions regarding pure principles of law. Accordingly, the action of the district court with respect to the conduct of the voir dire is affirmed.

*Violation of Rule 16*

Appellants Chastain, Hopkins, and Morris contend that the district court erred in allowing United States Customs Agent Richard Morris to testify as an expert witness, and that the court should have granted their motion for a mistrial because the government violated Federal Rule of Criminal Procedure 16(a)(1)(E)

with respect to this witness. The record indicates that the government failed to disclose its intention to call Agent Morris as an expert witness, although he had been listed as a lay witness. The Appellants argue that they were, thus, substantially prejudiced. The government responds that it was only through inadvertence that Morris was not disclosed as a potential expert witness, and, more significantly, did not violate defendants' substantial rights, because the record discloses that the trial judge afforded Appellants sufficient opportunity to interview the expert in the midst of the trial, thus allowing them access to adequate information to cross examine the witness. In addition, because of a break in the trial, Appellants had ample opportunity—three days—to find a rebuttal witness, nor was there a proffer as to what a rebuttal witness would have testified. None of the Appellants moved for a continuance.

"Violations of Rule 16 will result in a reversal of conviction only if such a violation prejudices a defendant's substantial rights." *United States v. Perez-Garcia,* 904 F.2d 1534,1546 (11th Cir.1990). In determining the proper remedy for the government's violation of discovery rules, the Court must consider "how the violation affected the defendant's ability to present a defense." *United States v. Noe,* 821 F.2d 604, 607 (11th Cir.1987). Furthermore, "where it is apparent ... that [the] defense strategy may have been determined by the failure to [disclose], there should be a new trial." *Id.* (*citing, United States v. Rodriguez,* 799 F.2d 649, 654 (11th Cir.1986) (per curiam) *quoting, United States v. Padrone,* 406 F.2d 560, 561 (2nd Cir.1969) (per curiam)). In other words, actual prejudice must be shown. The Court concludes that Appellants have not shown that the failure to disclose the existence of this expert adversely affected their ability to present a defense. Appellants were not substantially prejudiced and the denial of a motion for mistrial was appropriate.

Although the Court finds there has been no violation of Rule 16, the Court is not impressed with the government's behavior and actions in this case. The government listed the agent as a lay witness and then elicited expert testimony when he testified. There is no excuse for violating Rule 16 even when it results, as it did in this case, in no prejudice to the Appellants.

With respect to Agent Morris, the Appellants also argue that the district court abused its discretion when it permitted him to testify as an expert. The district court's decision on the competency of, and the weight to be accorded to, the testimony of an expert is a highly discretionary one. *See Increase Minority Participation by Affirmative Change Today v. Firestone,* 893 F.2d 1189, 1195 (11th Cir.1990). Therefore, the decision to admit Agent Morris' testimony as an expert can only be reversed if the decision is manifestly erroneous. Appellants do not challenge the extensive experience of Agent Morris in the areas about which he testified. He had been a pilot for more than 21 years. He was also a flight instructor. Agent Morris received extensive training in drug smuggling using airplanes at the United States Customs Service where he had spent ten years investigating drug smuggling. He had previously testified six times as an expert in the area of smuggling drugs by plane. He was clearly qualified as an expert.

Federal Rule of Evidence 702 permits expert testimony to be admitted when it is helpful to the finder of fact in determining a fact in issue. Morris' testimony was used to educate the jurors on the general techniques of drug smugglers and about certain modifications that were made to Beatty's airplane that would make the plane more suitable for drug smuggling. This information was clearly relevant to establishing the existence of a conspiracy to smuggle marijuana by using an airplane. Neither the court's decision to consider Agent Morris an expert, nor its decision to admit his testimony regarding drug smuggling techniques, including specific modifications to airplanes, can be considered an abuse of discretion. For that reason, the court's decision to admit Agent Morris' testimony is affirmed.

*Material Variance Between Indictment Charges and Proof at Trial*

Appellants contend that the government failed to prove the single conspiracy to import and possess marijuana as charged in the indictment. They argue that the government's evidence actually showed multiple conspiracies and, thus, there was a material variance between the indictment and the proof advanced at trial. The standard of review for whether there is a material variance between the allegations in the indictment and the facts established at trial is twofold: First, whether a material variance did occur, and, second, whether the

defendant suffered substantial prejudice as a result. *See United States v. Prince,* 883 F.2d 953, 959 (11th Cir.1989).

In determining whether a jury could have found a conspiracy, three factors are considered: first, was there a common goal;[9] second, what was the nature of the criminal scheme; and third, what was the overlap of the participants in the various dealings of the conspiracy. *See Calderon,* 127 F.3d 1327, *see also United States v. Coy,* 19 F.3d 629, 633 (11th Cir.1994), *United States v. LaSpesa,* 956 F.2d 1027, 1031 (11th Cir.1992). Further, "[N]o material variance will exist if a reasonable trier of fact could have found beyond a reasonable doubt the existence of a single conspiracy charged in the indictment." *United States v. Starrett,* 55 F.3d 1525, 1552 (11th Cir.1995). (*quoting United States v. LeQuire,* 943 F.2d 1554, 1561 (11th Cir.1991) *cert. denied,* 505 U.S. 1223, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992)).

As the evidence must be viewed in the light most favorable to the government, the Court finds that a reasonable jury could have concluded that a single conspiracy existed among Appellants and their co-defendant Beatty, as was charged in the indictment. Application of the elements of a conspiracy to these facts is illustrative of the Court's finding. First, the importation of marijuana was a common goal to all the Appellants. Second, the nature of the underlying scheme was the same insofar as the Appellants and their co-defendant were attempting to import marijuana from Jamaica via an airplane. The fact that one airplane was used unsuccessfully and a different airplane was contemplated for the second attempt is not so significant as to preclude a reasonable jury from finding that a single conspiracy existed over the entire period of time. Third and last, there was sufficient overlap among the participants. There was evidence that co-defendant Beatty and Appellant Chastain played important roles in both attempts. The jury also heard evidence that Appellants knew each other personally and were well aware of each other's roles and activities in the importation scheme.

---

[9]Under *United States v. Calderon,* 127 F.3d 1314, 1327 (11th Cir.1997), " 'common' means 'similar' or 'substantially the same' rather than 'shared' or 'coordinate.' "

Moreover, Appellants Hopkins and Chastain do not contend that they were surprised unfairly and Morris fails to show he was deprived of fair notice of the crimes charged. *See United States v. Glinton,* 154 F.3d 1245, 1252 (11th Cir.1998). Accordingly, Appellants are not entitled to prevail on this issue.

*Jury Instructions*

Appellants Chastain, Hopkins, and Rucks contend that the district court erred in denying their request for a multiple conspiracy instruction. Such an instruction is required when the indictment charges several defendants with one overall conspiracy, but the proof at trial indicates a jury could reasonably conclude that some of the defendants were involved only in separate conspiracies unrelated to the overall conspiracy charged in the indictment. *See Calderon,* 127 F.3d at 1328.

While generally it is for the jury to determine whether one or several conspiracies existed, *United States v. Becker,* 569 F.2d 951, 961 (5th Cir.), *cert. denied,* 439 U.S. 865, 1048, 99 S.Ct. 188, 726, 58 L.Ed.2d 174, 708 (1978),[10] whether the defense produced sufficient evidence to sustain an instruction such as a multiple conspiracy is a question of law. *See Calderon,* 127 F.3d at 1328. The district court, in determining whether an instruction for a multiple conspiracy should be given, considers whether there is sufficient evidence for a reasonable jury to conclude that some of the defendants were involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment. *Id.* However, as discussed above, the government was able to prove a single conspiracy involving all of the Appellants. To the extent there might have been subgroups operating pursuant to the general conspiracy, the evidence, viewed in the best light for the government, demonstrated they were all acting in furtherance of one overarching plan. *Id.* The district court, therefore, did not err in refusing to give the requested multiple conspiracy instruction.

Appellant Morris also argues that the district court erred in refusing to give his requested theory of defense jury instruction. The district court's refusal to give a requested "theory of defense" instruction is reviewed for abuse of discretion. *See United States v. Morales,* 978 F.2d 650, 652 (11th Cir.1992). Thus, the refusal to give a requested jury instruction warrants reversal only if the requested instruction (1) was

---

[10]The Eleventh Circuit, in the *en banc* decision, *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

correct; (2) was not substantially covered by the charge actually given; and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense. *Id. accord United States v. Camejo,* 929 F.2d 610, 614 (11th Cir.1991). Beyond that, "the district court has broad discretion in formulating its charge as long as the charge accurately reflects the law and the facts." *See United States v. Winchester,* 916 F.2d 601, 604 (11th Cir.1990) (*quoting, United States v. Gold,* 743 F.2d 800, 819 (11th Cir.1984)).

Morris's proposed charge, however, merely served to emphasize the law regarding reasonable doubt as to the existence of specific intent to enter a conspiracy. Those issues were covered sufficiently by the district court's actual jury instructions. Morris's proposed instruction was no more than a summary of Morris's defense rather than the exposition of a pertinent legal theory. The district court did not commit error in refusing to give Appellant Morris's requested instruction.

### *Sufficiency of the Evidence*

Appellants challenge the sufficiency of the evidence to sustain their convictions. The Court reviews sufficiency of the evidence *de novo,* with the evidence being viewed in the light most favorable to the government. *See Starrett,* 55 F.3d at 1541. A conviction must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of the evidence. *See United States v. Camargo-Vergara,* 57 F.3d 993, 997 (11th Cir.1995). To the extent that Appellants' argument depends upon challenges to the credibility of witnesses, the jury has exclusive province over that determination and the court of appeals may not revisit this question. *See United States v. Hewitt,* 663 F.2d 1381, 1386 (11th Cir.1981) (where the testimony of the witnesses was not incredible as a matter of law, [the court] must accept this determination by the jury).

Contrary to the contentions of the Appellants, the record, as shown above, demonstrates that the government presented more than sufficient evidence from which a reasonable jury could conclude, beyond a reasonable doubt, that Appellants committed the actions for which they were convicted. The most glaring example of this is the fact that the government informant repeatedly tape-recorded the Appellants, at various

times, discussing in detail the plans to import marijuana from Jamaica by plane. Accordingly, Appellants' contentions on this issue are wholly without merit.

*Motions for Mistrial*

Appellant Hopkins contends that the district court erred in denying his motion for a mistrial following government Agent Bateman's response to a question on cross-examination. Hopkins argues that Agent Bateman's response was impermissible because it was a comment on Hopkins' constitutional right to remain silent and, thus, requires a reversal of his conviction. The Court reviews a refusal to grant a mistrial based on a comment regarding a defendant's right to remain silent and improper questioning on a previous conviction for abuse of discretion. *See United States v. Dodd,* 111 F.3d 867, 869 (11th Cir.1997).

To determine whether there has been an impermissible comment upon a defendant's right not to testify at trial, the district court must consider, whether the statement was manifestly intended or was of such character that a jury would naturally and necessarily take it to be a comment on the failure of an accused to testify. *Id.* It follows logically, then, that the court must consider the circumstances in which the statement was made. *See United States v. Vera,* 701 F.2d 1349, 1362 (11th Cir.1983) (*modified on other grounds, United States v. Toler,* 144 F.3d 1423 (11th Cir.1988)). In this case, the exchange occurred between Hopkins' counsel, Mr. Garland, and the witness, Agent Bateman:

> MR. GARLAND: Did you do any actual investigation of the incident other than—such as speak to the owner of the airplane or the previous owner of the airplane, TNT Aviation, Lyle Travis?
>
> * * *
>
> AGENT BATEMAN: Lyle Travis. I never spoke with Mr. Travis, and when Mr. Hopkins was arrested, he wanted his attorney—matter of fact, his first attorney—
>
> MR. GARLAND: I object, it's non-responsive.
>
> THE COURT: Objection overruled. Go ahead and answer, sir.
>
> AGENT BATEMAN: Mr. Hopkins was—when we—when I first saw him was at an attorney's office and we agreed to let him finish meeting and he would be surrendered to our office, the attorney instructed us not to ask him any questions, and therefore, I did not.

Agent Bateman's comments were direct responses to defense counsel's open-ended question, and cannot be construed to be "manifestly intended" to be a comment on Hopkins' exercise of his privilege not to testify, and a rational jury could not take it to be so. Plainly, the trial judge was well within his discretion to reach that conclusion. The district court's decision, therefore, to deny Hopkins' motion for a mistrial is affirmed.

Appellant Morris also moved for a mistrial based upon the government's attempt to question him about a prior conviction for tax evasion. A defendant is entitled to a grant of mistrial only upon a showing of substantial prejudice. *See United States v. Funt,* 896 F.2d 1288, 1295 (11th Cir.1990). Here, the record clearly indicated that the district court acted immediately to block the government from pursuing this line of questioning. Furthermore, it also gave the jury a curative instruction. The Court noted previously that it will not overturn a lower court's refusal to grant a mistrial where the record shows that appropriate curative instruction were given, "unless the evidence is so highly prejudicial as to be incurable by the trial court's admonition." *Id.* (*citing, United States v. Tenorio-Angel,* 756 F.2d 1505, 1512 (11th Cir.1985)) *quoting, United States v. Slocum,* 708 F.2d 587, 598 (11th Cir.1983). In the circumstances of this case, the court acted properly and was well within its discretion when it denied Morris's motion for a mistrial.

*Outrageous Government Misconduct*

Appellant Rucks contends that outrageous conduct by the government warrants a dismissal of the indictment. Specifically, his allegation is that the entire conspiracy was manufactured by the government.

A conviction may be overturned when the government is involved in the criminal activity only when the government's involvement "violates fundamental fairness and shocks the universal cause of justice." *United States v. Walther,* 867 F.2d 1334, 1339 (11th Cir.1989). Otherwise, the government's "infiltration of criminal activity is 'a recognized and permissible means of investigation.'" *United States v. Tobias,* 662 F.2d 381, 386 (5th Cir. Unit B 1981) (*citing United States v. Russell,* 411 U.S. 423, 432 93 S.Ct. 1637, 1643 36 L.Ed.2d 366 (1973)).[11]

---

[11]Decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981, are binding precedent in this circuit. *See Stein v. Reynolds Securities, Inc.,* 667 F.2d 33,34 (11th Cir.1982).

The government's conduct in this case obviously was well within constitutionally permitted limits. Appellant Rucks was a predisposed active participant as evidenced by his participation in the events leading up to the failed first attempt. Furthermore, there was sufficient evidence presented to the jury showing that it was Rucks who approached the government's informant about obtaining a plane and a pilot, thus directly contradicting Rucks' claim that the government manufactured the crime. There is no evidence of the sort of extreme circumstances of outrageous government conduct needed even to constitute minimally a due process violation.

*Application of the Sentencing Guidelines*

Appellants Chastain, Hopkins, and Rucks challenge their sentences imposed by the district court. The district court's factual findings for sentencing purposes under the Federal Sentencing Guidelines are reviewed for clear error, but the district court's application of the Guidelines to those facts is reviewed *de novo. See United States v. Cannon,* 41 F.3d 1462, 1466 (11th Cir.1995).

Appellant Chastain claims that the district court erred in its application of a two-level upward adjustment, pursuant to § 3B1.3 of the Guidelines, for use of a "special skill."[12] Chastain claims that this guideline does not apply to a person who flies airplanes only as a "hobby." The commentary to § 3B1.3, to which the court must defer, however, defines "special skill" as any "skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include *pilots,* lawyers, doctors, accountants, chemists, and demolition experts." U.S.S.G. § 3B1.3, Application No. 3 (emphasis added). Neither the plain language of § 3B1.3, nor anything in the Commentary suggests a distinction between "professional" and "amateur." If in fact it did, it would be a distinction without a difference, for in either case, the harm, namely, the "abuse [of] ... special skills to facilitate significantly the commission ... of a crime" occurs whether Chastain was a professional or an amateur pilot. *Id., Commentary, Background.* It is undisputed that without a competent pilot, whether a "professional" or an "amateur," this conspiracy would have been inconceivable. To exclude non-professionals possessed with the same skills and,

---

[12]§ 3B1.3 states: "If the defendant ... used a special skill, in a manner that significantly facilitated the commission or concealment of the offense increase by two-levels."

therefore, the same ability to "facilitate" the commission of crimes would be to attribute an element of arbitrariness and irrationality to the Federal Sentencing Guidelines. Therefore, the district court's application of § 3B1.3 to Chastain was proper.

Appellant Hopkins argues that the district court used an incorrect amount of marijuana in determining his sentence. He contends that the amount used at sentencing was greater than what the planes involved could have carried physically. In the record, however, there is evidence to support a conspiracy to import approximately 1500 pounds of marijuana. Therefore, the district court's application of between 800 and 900 pounds in determining the sentence was not clearly erroneous.

Appellants also challenge the district court's application of a two-level upward adjustment for their plan to use a private plane to import narcotics, pursuant to U.S.S.G. § 2D1.1(b)(2). § 2D1.1(b)(2) states, *inter alia,* that "If the defendant unlawfully imported or exported a controlled substance under circumstances in which an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance, ... increase by two levels."

Appellants argue that the enhancement was inappropriate because no actual importation or "use" occurred on these facts. The district court below, in applying the enhancement, endorsed a broad interpretation of the plain language of the guidelines, relying on the terms "Attempt or Conspiracy" found in the title of § 2D1.1.

The Ninth Circuit, previously confronted with interpreting § 2D1.1(b)(2), held that the intent to use a private plane was not enough to warrant the two-level enhancement. *See United States v. Joelson,* 7 F.3d 174, 180 (9th Cir.1993) (*cert. denied,* 510 U.S. 1019, 114 S.Ct. 620, 126 L.Ed.2d 584). In Appellants' case, there was clearly an attempt and a conspiracy, on which the district court relied in applying this enhancement. However, the plain language of the guideline that uses the past tense, viz "used to import," cannot be ignored. When the language of the guideline is clear, it is not necessary to look elsewhere for interpretation. Here, the language of the guideline clearly contemplates a completed event, an actual importation. That did not occur in this case. The Court will not look to the title of a guideline to explain what is quite clear in its text.

Thus, the district court's reliance on the terms in the title as explanatory of the guideline is misplaced. The two-level increase as applied to these three Appellants, therefore, was an error of law. Because it was incorrect for the district court to apply the enhancement, the sentences of Appellants Chastain, Hopkins, and Rucks are remanded for re-sentencing.

*CONCLUSION*

For the foregoing reasons we **AFFIRM** the judgment of the district court on all issues presented in this appeal, except that we **REVERSE** and **REMAND** for sentencing with respect to the erroneous application of a two-level increase pursuant to § 2D1.1(b)(2) of the Federal Sentencing Guidelines.