[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-10476

_____

D.C. Docket No. 2:14-cr-00124-SPC-CM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSE BENITEZ, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 27, 2018)

Before JILL PRYOR, ANDERSON and HULL, Circuit Judges.

PER CURIAM:

After a jury trial, Jose Benitez challenges his conviction for armed bank robbery. Benitez argues that the district court committed two errors during his trial: (1) omitting from its jury instruction the phrase "that is a firearm," which was included in Benitez's indictment and (2) admitting into evidence some of Benitez's prior convictions. After careful review, and with the benefit of oral argument, we affirm.

## I. BACKGROUND

### A. Indictment

On October 29, 2014, a grand jury charged Benitez with one count of armed bank robbery, in violation of 18 U.S.C. § 2113(a) and (d) (Count One), and one count of using and carrying a firearm during the crime of violence alleged in Count One, in violation of 18 U.S.C. § 924(c)(l)(A)(ii) (Count Two). The jury convicted Benitez on only Count One. We review the elements of armed bank robbery, the pretrial proceedings, and then the evidence at trial.

### B. Elements of Armed Bank Robbery

Count One charged that Benitez

> did knowingly by force and violence and intimidation, take and cause to be taken from the person and presence of bank employees, certain property and money, that is United States currency in the approximate amount of $12,824.00, belonging to and in the care, custody, control, management, and possession of Iberia Bank . . . and in committing said offense, [Benitez] did assault and

2

put in jeopardy the life of another person <u>by the use of a dangerous weapon, that is a firearm</u>.

For the sake of clarity and brevity, we later on refer to "that is a firearm" as the "firearm phrase."

The elements of armed bank robbery are: (1) the defendant knowingly took money in the care, custody, control, management, or possession of a federally insured bank from or in the presence of the person described in the indictment; (2) by means of force and violence or by means of intimidation; and (3) knowingly assaulted a person or put a person's life in jeopardy by using a "dangerous weapon or device" while stealing the property or money from the bank.  18 U.S.C. § 2113(a), (d); <u>see also</u> <u>Eleventh Circuit Pattern Jury Instructions (Criminal Cases) 2010</u>, Judicial Council of the Eleventh Circuit, Instruction 76.2 (June 21, 2010).[1] Under this Circuit's precedent, a toy gun or a replica of a firearm constitutes a "dangerous weapon or device" for purposes of 18 U.S.C. § 2113(d).  <u>United States</u>

---

[1] In relevant part, the federal armed bank robbery statute provides that:

(a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association

. . .

Shall be fined under this title or imprisoned not more than twenty years, or both.

(d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person <u>by the use of a dangerous weapon or device</u>, shall be fined under this title or imprisoned not more than twenty-five years, or both.

18 U.S.C. § 2113(a), (d) (emphasis added).

v. Garrett, 3 F.3d 390, 391 (11th Cir. 1993).  What matters is how others perceive the weapon.  United States v. Woods, 127 F.3d 990, 993 (11th Cir. 1997) (explaining that "possession of what appears to be a gun during a robbery can play an integral part in the commission of the crime and evidences, in the mind of the victim, an ability to use a weapon").

## C. June 4, 2015 Change of Plea Hearing

On June 4, 2015, Benitez stated that he was going to plead guilty on Count One without a plea agreement, but that he was going to maintain his plea of not guilty on Count Two.  The government opposed splitting the pleas in this way.  The government argued that Benitez could not plead guilty to Count One without admitting that he possessed a firearm during the bank robbery, which would foreclose Benitez's ability to plead not guilty to the firearm offense in Count Two.

In response, the district court suggested that the firearm phrase after "dangerous weapon" in Count One was surplusage.  Benitez agreed with the district court, maintaining that he could be convicted of Count One without the government proving that he used an actual firearm.[2]  As Benitez reasoned, the government need prove only that Benitez used a dangerous weapon, which could even be a "toy gun."  Accordingly, Benitez could plead guilty to Count One

---

[2]The transcript incorrectly attributes this statement to the government, but the context makes clear that it was Benitez's counsel who made this statement.

(armed bank robbery with a replica of a gun) and not guilty to Count Two (which required an actual firearm).[3]

The government disagreed, insisting that Benitez's use of a firearm was an element of the robbery offense charged in Count One.  The district court again questioned the government why the firearm phrase was not surplusage.  In response, the government conceded that the firearm phrase did not "enhance" the bank-robbery-with-a-dangerous-weapon offense charged in Count One, but explained that its position at trial would be that Benitez used a firearm.  The government acknowledged, however, that its position meant that Benitez could admit at trial that he committed the robbery with a dangerous weapon that was not a firearm and still defend against the firearm charge in Count Two.

The district court then asked defense counsel whether, assuming the firearm phrase was surplusage, Benitez would be willing to plead guilty to Count One by admitting that he robbed the bank with a dangerous weapon without specifying that the dangerous weapon was a firearm.  Counsel for Benitez answered yes, acknowledging again that a "toy gun" would constitute a dangerous weapon under the bank robbery statute in 18 U.S.C. § 2113(d).

---

[3]As it is used in 18 U.S.C. § 924(c)(1), the term "firearm" means:
> (A) any weapon (including a starter gun) which will or is designed
> to or may readily be converted to expel a projectile by the action of
> an explosive; (B) the frame or receiver of any such weapon;
> (C) any firearm muffler or firearm silencer; or (D) any destructive
> device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3).

5

The district court gave both parties seven days to file memoranda and scheduled a status conference for July 13, 2015. On June 12, 2015, the government submitted a memorandum positing that the firearm phrase was an element of Count One and that Benitez could not plead guilty to Count One without admitting that he carried a firearm during the robbery. Benitez did not file a memorandum.

**D. July 13 and August 10, 2015 Status Conferences**

At the status conference on July 13, 2015, the district court stated that it had reviewed all of the information and pleadings submitted by counsel and would allow Benitez to plead guilty to Count One but still contest his guilt on the firearm offense charged in Count Two. In other words, because the firearm phrase in Count One was surplusage, Benitez could admit that the weapon used in the bank robbery was a dangerous weapon (a "toy" or replica gun). Thus, Benitez would not have to admit that the dangerous weapon was an actual firearm.

Nearly a month later, on August 10, Benitez's counsel informed the district court that Benitez no longer intended to plead guilty on Count One. The district court then scheduled the trial for September.

Before trial, the government gave notice that if Benitez testified, it intended to use Benitez's seven prior convictions for impeachment purposes at trial. These convictions were a 1988 Florida conviction for burglary of a structure, a 1989

Florida conviction for resisting an officer with violence, a 1994 Florida conviction for aggravated battery, 1996 Florida convictions for bank robbery without a weapon, grand theft, and battery on an EMT or firefighter, and a 1996 federal conviction for conspiracy to distribute narcotics.  Ultimately, the district court allowed the government to question Benitez on only the 1996 convictions for grand theft, battery on an EMT or firefighter, and conspiracy to distribute narcotics.  On appeal, Benitez challenges the admission of these three 1996 convictions.

## II. TRIAL EVIDENCE

Benitez's trial began on September 23, 2015 and lasted two days.

### A. Opening Statements

In its opening statement, the government argued that, on October 8, 2014, Benitez walked into the Cape Coral Iberia Bank wearing black clothing and covering his face.  Upon entering, Benitez pointed a handgun at several of the bank's employees and ordered them to lie on the ground before filling a satchel with the bank's money.

In defense counsel's opening statement, defense counsel conceded that Benitez committed the robbery but stated that the single trial issue for the jury to decide was whether Benitez committed the robbery with a firearm or with a replica

of a firearm.  Benitez's counsel argued that the government would not be able to prove that Benitez carried an actual firearm when committing the robbery.

## B. Government's Evidence

As part of its case-in-chief, the government introduced five witnesses who were present at the bank during the robbery.  In sum, the witnesses testified that, on October 8, 2014, a masked man with dark sunglasses entered the Iberia Bank in Cape Coral Florida.  Shortly after entering, the man brandished what appeared to be a black handgun, ordered several of the bank's employees to lie on the floor, and forced the bank's tellers to give him over $12,000 in cash.  The robber then fled the scene, but left a pair of sunglasses on the tellers' counter.  Law enforcement investigators would later match fingerprints found on the sunglasses to Benitez.

Catherine Lango, a bank employee, testified that when Benitez entered the bank, he covered his face and brandished an object that looked like a gun.  Based on Benitez's demeanor, Lango believed that he would shoot one of her coworkers.  Although Lango had no experience with guns, she believed that what Benitez was carrying was a real gun because it looked authentic and because he was using it to threaten the bank's employees.  On cross-examination, Lango testified that the gun looked similar to the ones on fictional television shows.

Gaile Sheehan, a bank teller, testified that Benitez walked up to her, pointed what appeared to be a gun at her, and demanded money.  Sheehan gave Benitez the money because she thought he was going to kill her if she did not, based on the gun and his angry demeanor.  Sheehan did not have any training in firearms but stated that the gun looked real to her.

Michael Piggott, the bank's branch manager, testified that Benitez pointed what Piggott believed was a gun at him and told him to get on the ground.  Piggott complied because he was in fear for his life, believing that the firearm was real because he saw the bore of the gun and Benitez had his finger outside of the trigger guard.  Piggott had experience with firearms because he grew up in the military, had participated in firearm training as part of the Army's Reserve Officer Training Corps ("ROTC") during his freshman and sophomore years of college, and continued to own and shoot several guns.  On cross-examination, Piggott testified that the gun looked like a real gun in the same way that guns portrayed on television shows do.  Piggott also opined that the gun looked like a .380 caliber handgun, noting that he owned this type of firearm.

Nancy Coxe, the bank's assistant branch manager, testified that she was in Piggott's office when Benitez entered the bank.  After Benitez noticed Coxe, Benitez pointed what looked like a semi-automatic handgun at her and told her to get on the ground.  Coxe thought Benitez was going to shoot her.  Coxe had

9

experience with firearms because she participated in ROTC in high school and had fired several types of guns. Coxe explained that she did not think Benitez's gun was a toy gun because of its color and because it looked similar to a gun she had shot in the past. Coxe thought the gun was a real gun because of the way that Benitez was holding it. On cross-examination, Coxe testified that she believed the gun was real, but acknowledged that she did not think anyone could be completely sure unless they touched it.

Tina Pizzola, a former teller at the bank, testified that she was outside of the bank in the parking lot when Benitez entered the bank. Pizzola testified that Benitez stepped towards her, pointed what she believed to be a gun at her face, and told her to get on the ground. Though Pizzola had no personal experience with firearms, she believed that Benitez was carrying a gun because she had seen both her father and brother-in-law (both former law enforcement officers) carry firearms. Pizzola also testified that she had seen toy pistols because her grandsons played with them. Pizzola conceded that she did not know for sure if the gun was real, but that she "wasn't about to test [Benitez] to see if it was real or not," fearing that Benitez would shoot her.

10

## C. Videos and Photographs

At trial, the parties introduced several photographs and the bank's security videos showing Benitez robbing the bank. Here is one of the images presented to the jury that shows the gun in Benitez's hand.



## D. Defense's Evidence

The defense called Benitez as its first witness. Benitez testified that he robbed the bank carrying "a fake, plastic gun" that was a replica of a real firearm. On cross examination, Benitez admitted that he lied to the police by telling them that he had not committed the robbery. The government also questioned Benitez

about his 1996 convictions under Florida law for grand theft and battery on an EMT or firefighter and a 1996 federal conviction for conspiracy to distribute narcotics. Benitez admitted to all three convictions.

The defense's second witness was Blanca Vega, Benitez's 15-year-old daughter. Vega testified that, in September 2014 (shortly before the bank robbery), she had taken a photograph of herself with a fake pistol and posted it on social media. After school officials became aware of the photograph, they contacted Benitez, who told the school officials that the firearm was not real, but a toy gun. Vega testified that she had looked at videos and photographs of Benitez robbing the bank and believed that Benitez was carrying that same firearm replica when he robbed the bank.

The defense's third witness was Michael Galbreath, Vega's school principal. Galbreath testified that he had investigated Vega's picture and had not found reason for concern.

The fourth defense witness was Alfred Olsen, a private investigator and former law enforcement officer. Olsen testified that he evaluated the security video from the bank and attempted to determine what type of weapon or instrument was used during the robbery. Olsen stated that the weapon held by Benitez appeared to be a Browning Hi-Power handgun, but that the weapon was distinguishable from a Browning Hi-Power handgun in several respects. Olsen

12

then opined that the weapon was an Ekol Aras Magnum replica gun that fired

blanks.

Olsen also acknowledged that the Ekol Aras Magnum could be converted so

that it could fire live rounds.  However, Olsen stated that the conversion would

require changing out the barrel and rechambering the gun, which was a

complicated process.  Based on his evaluation, Olsen did not believe Benitez used

a real firearm during the robbery.

### E.  Government's Rebuttal Evidence

In rebuttal, the government called Max Kingery, the chief of the firearms

technology criminal branch of the Bureau of Alcohol, Tobacco, Firearms, and

Explosives.  Kingery reviewed the security video from the bank in which Benitez

held a handgun, but he could not definitively say if it was a handgun or a firearm

replica.  Kingery explained that it was impossible to tell based on a video whether

the weapon was a replica of a firearm, an actual firearm, or something that could

be readily converted into a firearm.

Kingery also testified that some of the features of an Ekol Aras Magnum

could be present on firearms that are capable of firing projectiles.  Kingery further

noted that the Ekol Aras Magnum could be readily converted into a weapon

capable of firing a projectile using a relatively simple process, and that his own

13

office had made such a conversion.  Finally, Kingery opined that the gun in the photo of Benitez's daughter and the gun used in the robbery were not the same.

After Kingery testified, Benitez recalled Olsen, who disputed Kingery's testimony about the viability of converting an Ekol Aras Magnum into an operable firearm.

## F. Closing Arguments

During its closing argument, the government argued Benitez was guilty of Count One regardless of whether he was carrying a real gun or a fake gun during the robbery, as he had admitted to carrying out the robbery with a toy gun.  The government also argued that Benitez was guilty of Count Two, as the evidence showed that Benitez was carrying a functioning firearm during the robbery.

In defense counsel's closing argument, Benitez's counsel explained to the jury that, because Benitez had admitted to committing the robbery, "the bulk of [the jury's] decision" would be on Count Two.  Benitez's counsel then argued that the government failed to prove that Benitez carried an actual firearm during the robbery.  Benitez's counsel asked the jury to find Benitez not guilty of Count Two.

## G. Jury Instructions

At the end of the first day of trial, the district court questioned the government about its proposed jury instructions,[4] which defined "dangerous

---

[4]Benitez did not file any proposed jury instructions.

14

weapon or device" as "any object that a person can readily use to inflict serious harm on someone else."[5]  Benitez objected to this definition, arguing that the government was required to prove that the object held by Benitez during the robbery was an actual firearm.  As Benitez reasoned, the government had "put [itself] into a corner by getting an indictment where the dangerous weapon that must be proven must be a firearm."

The government responded that, although the indictment had alleged that the dangerous weapon was a firearm, the firearm phrase was not an element of the offense.  Rather the element of the offense was a dangerous weapon.  Benitez agreed, but argued that the government had previously argued that the firearm phrase was not surplusage when contesting his guilty plea and thus had "adopted" the firearm phrase as an element.  The district court disagreed with Benitez, explaining that the district court had already ruled that the firearm phrase was surplusage and that it had previously given Benitez the option of pleading guilty to Count One without admitting that the dangerous weapon in question was a firearm.

The district court returned to this discussion on the second day of trial after Benitez's counsel finished questioning his last witness.  Benitez again contended that (1) the firearm phrase was not surplusage and (2) the government was

---

[5]This is the same definition as provided in the Eleventh Circuit's pattern jury instructions that were applicable at the time of Benitez's trial.  Eleventh Circuit Pattern Jury Instructions (Criminal Cases) 2010, Judicial Council of the Eleventh Circuit, Instruction 76.2 (June 21, 2010).

15

estopped from changing its argument at trial.  In response, the government argued that it had changed its position because the district court had ruled that the firearm phrase was surplusage at the July 13 status hearing.

The district court agreed with the government, reminding Benitez that, during the July 13 status hearing, it had given Benitez the option of pleading guilty to Count One—that he committed the robbery with a dangerous weapon without specifying that it was a firearm—and that Benitez was therefore clearly on notice that the district court found the firearm phrase to be surplusage.  The district court also stated that the language was surplusage because the particular type of dangerous weapon used was not an element under 18 U.S.C. § 2113(d).[6]

After the parties' closing arguments, the district court instructed the jury that Benitez could be convicted of armed bank robbery in Count One if the government proved that he knowingly took money or property from the bank through force and violence or intimidation, and in doing so assaulted someone or put someone's life in jeopardy by using a dangerous weapon or device while stealing the property or money.  The district court defined "dangerous weapon or device" to include "any object that a person can readily use to inflict serious bodily harm on someone else."  The district court stated that incitement of fear was sufficient to characterize an apparently dangerous object as a "dangerous weapon or device," regardless of

---

[6]The district court also omitted the firearm phrase from the verdict form given to the jury, without any objection from Benitez.

whether the object could actually put someone's life in jeopardy.[7]  Benitez then renewed his objection to the jury instructions.

## H. Deliberations and Verdict

During deliberations, the jury asked two questions, both relating to the definition of "firearm" in Count Two.  The jury first asked "by federal statute is a gun firing blanks a firearm?"  The jury also asked "what is [sic] federal statute of readily convertible firearm?"  There were no questions about Count One.

The district court answered the jury's question by stating "you have been given all of the instructions on the law. Any terms that are not defined in the jury instructions are to be given their plain and ordinary meaning."  Neither party objected to the district court's answer.

After nearly three hours of deliberations, the jury found Benitez guilty of the § 2113(a) and (d) armed bank robbery charged in Count One, but found him not guilty of the § 924(c) firearm offense charged in Count Two.

## I. Sentencing

On January 4 and 25, 2016, the district court conducted Benitez's sentencing hearing.[8]  During the first hearing, Michael Piggott, the bank's manager, testified

---

[7]As to Count Two, the district court instructed the jury that a "firearm" means "any weapon designed to or readily convertible to expel a projectile by the action of an explosive. The term includes the frame or receiver of any such weapon or any firearm muffler or silencer."  This is the definition provided in the pattern jury instructions that were applicable at the time of Benitez's trial. See Eleventh Circuit Pattern Jury Instructions (Criminal Cases) 2010, Judicial Council of the Eleventh Circuit, Instruction 35.2 (June 21, 2010).

17

about the effect the robbery had on Lango, Sheehan, Coxe, and Pizzola.  Piggott explained that all of them were receiving psychological treatment and that one had been diagnosed with posttraumatic stress disorder.  Piggott also noted that all five employees had been transferred to other Iberia Bank branches so that they would not have to work in the branch where the robbery took place.

When the district court resumed Benitez's sentencing hearing on January 25, 2016, it declined to apply a six-level enhancement for use of a firearm during the robbery, as provided for in U.S.S.G. § 2B3.1(b)(2)(B) (2015), finding that the government had not proven by a preponderance of the evidence that Benitez had used a firearm during the robbery.  Instead, the district court applied a four-level enhancement under U.S.S.G. § 2B3.1(b)(2)(D) in light of Benitez's use of a dangerous weapon during the robbery.

Based in part on this ruling, the district court calculated that Benitez had a total offense level of 26 and a criminal history category of II, giving him an advisory guidelines range of 70 to 87 months' imprisonment.  Based on the nature and circumstances of the crime, the effect on the bank's employees, and Benitez's

---

[8]During the January 4 hearing, Benitez objected to several enhancements applied in his presentence report.  The district court declined to rule on Benitez's objections at that time because the parties had not submitted legal support for their arguments.  The district court explained that it would resume Benitez's sentencing hearing on January 25 after considering each party's arguments.

criminal history, the district court sentenced Benitez to 122 months' imprisonment and five years of supervised release.

## III. DISCUSSION

### A. Firearm Phrase

On appeal, Benitez argues that the district court constructively amended the indictment when it omitted the firearm phrase in the indictment from its jury instructions on Count One.[9]

As this Court has explained, a constructive amendment occurs "when the essential <u>elements</u> of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." United States v. Keller, 916 F.2d 628, 634 (11th Cir. 1990) (emphasis added).

For several reasons, the district court did not constructively amend the indictment by not including the firearm phrase in its jury instructions, which were the pattern jury instructions. First, the armed bank robbery statute does not include as an essential element that the defendant used a firearm to carry out the offense—only that he carried a dangerous weapon, which, as we have noted, can be a "toy gun." See 18 U.S.C. § 2113(d); Garrett, 3 F.3d at 391. Because the firearm phrase was not an element of the armed bank robbery offense, no constructive amendment occurred when the district court omitted it from its jury instructions. See United

_____

[9]This Court reviews <u>de novo</u> whether a district court's jury instructions constructively amended the indictment. United States v. Gutierrez, 745 F.3d 463, 473 (11th Cir. 2014).

States v. Deverso, 518 F.3d 1250, 1258 n.2 (11th Cir. 2008) ("Congress defines the elements of an offense, not the charging document."). Stated another way, Benitez has not shown that the district court erred in giving the pattern jury instructions as to armed bank robbery, given that the type of dangerous weapon is not an element of that offense.

Second, and most importantly, this is not a case where the government removed "firearm" from the indictment and then tried to prove that the defendant carried a knife, a bomb, or another dangerous weapon. Rather, throughout the pretrial proceedings and the trial itself, Benitez admitted that his weapon looked like a firearm and acknowledged that the only issue at trial was whether the firearm was a replica gun or a real gun. Because the removal of the firearm phrase from the jury instruction did not broaden the elements of the conviction under Count One, no constructive amendment occurred.

Alternatively, Benitez argues that the district court's omission of the firearm phrase from the jury instructions amounted to a variance from the indictment.[10] See Keller, 916 F.2d at 634 (explaining that "[a] variance occurs when the facts proved at trial deviate from the facts contained in the indictment [even though] the

---

[10]"The standard of review for whether there is a material variance between the allegations in the indictment and the facts established at trial is twofold: First, whether a material variance did occur, and, second, whether the defendant suffered substantial prejudice as a result." United States v. Chastain, 198 F.3d 1338, 1349 (11th Cir. 1999) (citing United States v. Prince, 883 F.2d 953, 959 (11th Cir. 1989)).

20

essential elements of the offense are the same"). A variance requires reversal only when the defendant can establish both that the variance was material and that his rights were substantially prejudiced thereby. Id. at 633; United States v. Chastain, 198 F.3d 1338, 1349 (11th Cir. 1999).

Benitez's variance claim fails too. Simply put, there was no variance here between the indictment and the evidence at trial because both indicated that Benitez had a firearm of some sort (either real or a replica).

In any event, even assuming a material variance occurred, Benitez has not shown the required prejudice. First, the district court put Benitez on notice at the July 13 status hearing that the firearm phrase was surplusage and not an element of the armed bank robbery offense. At that hearing, the district court gave Benitez the option of pleading guilty to Count One by admitting to "all of the elements up to and including that the weapon used in the bank robbery was a dangerous weapon" while still maintaining his plea of not guilty to carrying a real firearm as charged in Count Two. The district court's statements were in agreement with the arguments of Benitez's counsel at the June 4 change of plea hearing, during which Benitez's counsel stated that Benitez would be willing to plead guilty to Count One if the firearm phrase were found to be surplusage. Because of the district court's ruling at the pre-trial hearing, Benitez also knew that the government would not have to prove that Benitez used a real firearm in order to obtain a conviction on

21

Count One.  The district court did not err in concluding that Benitez was "clearly" on notice that the district court considered the firearm phrase to be surplusage.

Benitez cannot now argue that he was disadvantaged by the district court's not including the firearm phrase in the jury instructions as to Count One at trial. Because he suffered no prejudice, there was no material variance that would warrant a reversal.

## B.  Admission of Prior Convictions

As noted earlier, the government gave notice before trial of its intent to introduce Benitez's seven prior convictions if he testified.

On the second day of trial, the government again stated that it intended to impeach Benitez with certain 1996 convictions.  Benitez objected, arguing that evidence of the convictions was inadmissible because they occurred over ten years ago and that their prejudicial effect outweighed their probative value.

The district court conducted an analysis under Federal Rule of Evidence 609(b).  The district court ruled that the government could impeach Benitez with his 1996 convictions for grand theft, battery on an EMT or firefighter, and conspiracy to distribute narcotics, noting that Benitez's credibility was a central issue at trial.  However, the district court determined that the government could not impeach Benitez with the 1996 bank robbery conviction, given the similarity between that conviction and the present offense.

22

The district court explained that "in weighing all of the factors, the probative value and the similarity between the past, the past crimes, and the crime charged, the point in time [of] the conviction, the defendant's subsequent history outweighs any prejudicial effect against the defendant." The district court also ruled that the government could not explore the details of those crimes.

Evidence of a defendant's prior convictions that are more than ten years old are admissible for impeachment purposes if the district court finds that the probative value of the convictions substantially outweighs any prejudicial effect. Fed. R. Evid. 609(b). In determining whether a prior conviction's probative value substantially outweighs its prejudicial effect for purposes of Rule 609(b), the district court considers (1) the impeachment value of the prior conviction, (2) the point in time of the conviction and the witness's subsequent history, (3) the similarity between the past crime and the charged crime, (4) the importance of the defendant's testimony, and (5) the centrality of the witness's credibility. United States v. Pritchard, 973 F.2d 905, 908-09 (11th Cir. 1992)

The district court did not abuse its discretion when it admitted evidence of three of Benitez's 1996 convictions: Florida convictions for grand theft and battery of an EMT or firefighter under Florida law, and his federal conviction for

23

conspiracy to distribute narcotics.[11]  Though some of the <u>Pritchard</u> factors weigh in Benitez's favor, the district court correctly noted the importance of Benitez's testimony and credibility, as he was the only witness who actually knew whether the object in question was a real or fake firearm.  <u>Id.</u> at 909 (upholding the admission of defendant's 13-year-old conviction because "the crux of the case was a credibility issue").  We find no reversible error.  <u>In re Rasbury</u>, 24 F.3d 159, 168 (11th Cir. 1994) ("By definition . . . under the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call.").

Alternatively, any alleged error was harmless, as the evidence was overwhelming that Benitez committed the armed bank robbery charged in Count One, and because Benitez was found not guilty on Count Two.  <u>United States v. Willner</u>, 795 F.3d 1297, 1321 (11th Cir. 2015) ("When there is overwhelming evidence of a defendant's guilt . . . non-constitutional error is harmless.").

## IV. CONCLUSION

For the foregoing reasons, we affirm Benitez's conviction for armed bank robbery in Count One.[12]

**AFFIRMED.**

---

[11]"The standard for review of a district court's decision to admit evidence of prior convictions pursuant to Rule 609 is abuse of discretion."  <u>Pritchard</u>, 973 F.2d at 908.

[12]In this direct appeal, Benitez has not raised any issues as to his sentence.

24