[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 29, 2003
THOMAS K. KAHN
CLERK

_____

No. 02-13307

_____

D. C. Docket No. 00-00832-CR-JAL

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EDGAR ALEXANDER TORREALBA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 29, 2003)**

Before HULL, MARCUS and FARRIS[*], Circuit Judges.

MARCUS, Circuit Judge:

This direct criminal appeal arises from appellant Edgar Alexander

Torrealba's November 14, 2001 convictions of one count of conspiracy to commit

_____

[*]Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

hostage taking, in violation of 18 U.S.C. § 1203(a), one substantive count of hostage taking, also in violation of § 1203(a), and one count of using and carrying a firearm during and in relation to a federal crime of violence, in violation of 18 U.S.C. § 924(c). On appeal, Torrealba asserts four errors at sentencing: (1) that the district court erred by dividing his conspiracy conviction into 3 different groups for sentencing purposes based on the 3 victims of his crimes; (2) that the court improperly applied a 6 level enhancement based on the making of a ransom demand; (3) that the district court erred by applying a 4 level enhancement based on his infliction of "permanent or life-threatening" injuries on one of his victims; and (4) that the court erred by denying his request for a downward departure. After thorough review, we are persuaded by none of them, and, accordingly, affirm.

I

On the evening of December 13, 1999, Wilma Christine Aragao ("Christine") and her children Alceau (age 9) and Alexander (age 1) had just returned home from a Christmas party when they were abducted by Torrealba and co-conspirators Ewin Oscar Martinez, Jean Carlo Ferreira and Pedro Farael Caraballo (collectively "the conspirators"). This kidnaping was the culmination of nearly six months of surveillance of the Aragao family by the conspirators, who

2

actually wanted to abduct Christine's husband and to extort ransom money from the Aragao family. However, the conspirators mistimed their efforts, and instead of kidnaping Mr. Aragao they abducted his wife and two of his children.

When the assailants approached her in the parking garage of her condominium complex, Christine was holding Alexander and Alceau was standing nearby. However, upon being severely beaten about the face and repeatedly shocked with a stun gun, Christine dropped Alexander to the concrete garage floor. Christine's injuries from this beating were severe. One of her cheekbones was fractured in three places, her jawbone was pushed completely into her face so as to render movement difficult and painful, and her right eye socket was completely shattered, causing internal hemorrhaging and nerve damage in and around the orbital socket. Additionally, she suffered several facial lacerations from the beating and the electrical charge from the stun gun left her burned and temporarily unconscious. Christine's treating physician opined that her facial symmetry will never be the same as it was prior to the attack and that the nerve damage she suffered is likely permanent, as are the scars that now mark her face. Alexander suffered multiple scrapes and bruises as a result of his fall. Alceau also was shocked with the stun gun and was burned as a result.

The three victims were taken to a North Miami home where they were strapped to lawn chairs, gagged and placed in separate pitch-dark closets.[1] Although Christine was unsure exactly how long she was restrained in this manner, she experienced extreme physical pain during her confinement. Moreover, she was able to hear the sobs of both of her children but was unable to respond in any way. Christine was forced to contact her husband by both cell phone and letter (although the letter never was mailed), and in her letter she mentioned "a $70,000 bounty."[2] Mr. Aragao alerted law enforcement authorities, who were able to track one of Christine's cell phone calls to the residence where she and her children were being kept. During the early morning hours of December 18, 1999, government agents rescued the victims. Christine, Alceau and Alexander each received medical attention, and Christine ultimately was forced to undergo reconstructive surgery to repair the facial injuries she sustained at the hands of her assailants.

Torrealba was not present in the home when the rescue was effected, and accordingly was not arrested until September 21, 2000. He was charged under a

---

[1]Indeed, following the family's rescue, authorities found in a closet a blood-stained aluminum-framed lawn chair.

[2]Because the letter was not mailed, the government does not argue that any ransom demand actually was delivered to Mr. Aragao.

4

superseding indictment with one count of conspiracy to commit hostage taking, in violation of 18 U.S.C. § 1203(a); one substantive count of hostage taking, in violation of 18 U.S.C. § 1203(a); and one count of using and carrying a firearm during and in relation to a federal crime of violence, in violation of 18 U.S.C. § 924(c). He subsequently pled guilty to each of these charges.

At sentencing, the district court divided Torrealba's offenses into 3 groups pursuant to U.S.S.G. §§ 1B1.2(d) and 3D1.2 based on the 3 victims. Group one related to the abduction of Christine, and ultimately featured an offense level of 36. This level was derived in the following way: The district court started with a base offense level of 24 under U.S.S.G. § 2A4.1(a). The court then applied a 6 level upward adjustment pursuant to U.S.S.G. § 2A4.1(b)(1) because it was reasonably certain that a ransom demand would have been made had the kidnappers not been thwarted, thereby bringing the offense level to 30. The district court then applied a 4 level increase pursuant to U.S.S.G. § 2A4.1(b)(2) to reflect Christine's permanent or life-threatening bodily injury, and a 2 level increase pursuant to U.S.S.G. § 3A1.1(b)(1) because the offense involved a vulnerable victim, thus resulting in the final adjusted offense level of 36. The second and third groups pertained to victims Alceau and Alexander, and featured

5

final adjusted offense levels of 34 and 32 respectively, with the discrepancy between them attributable to the different degrees of injury they suffered.[3]

The district court took the highest of these levels, 36, and added 3 additional levels to reflect the 3 victims. However, this upward adjustment was offset by a 3 level reduction pursuant to U.S.S.G. § 3E1.1(a) and (b)(1) for acceptance of responsibility. The court then considered Torrealba's request for a downward departure pursuant to U.S.S.G. § 5K2.0, but after acknowledging its discretion to grant the request denied it. The district court ultimately sentenced appellant to 280 months imprisonment[4] and 5 years supervised release.

On appeal, Torrealba claims that the district court erred by (1) dividing his offenses into 3 distinct groups based on 3 victims pursuant to U.S.S.G. §§

---

[3]Alceau's injuries -- i.e., the burns from the stun gun -- were more severe than those suffered by Alexander, who endured only some scrapes and bruises when Christine dropped him after being stunned.

[4]More specifically, Torrealba was sentenced to 220 months imprisonment on counts 1 and 2 of the indictment, to run concurrently, and 60 months on count 3, to run consecutively.

1B1.2(d)[5] and 3D1.2[6]; (2) applying a 6 level enhancement for the ransom demand

pursuant to U.S.S.G. § 2A4.1(b)(1)[7]; (3) enhancing his sentence based on the

_____

[5]This subsection provides:

> A conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit.

U.S.S.G. § 1B1.2(d).

[6]This section provides:

> All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:
>
> (a) When counts involve the same victim and the same act or transaction.
>
> (b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.
>
> (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.
>
> (d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

U.S.S.G. § 3D1.2.

[7]This subsection provides that "[i]f a ransom demand or a demand upon government was made, increase by 6 levels." U.S.S.G. § 2A4.1(b)(1).

7

severity of the injuries suffered by Christine pursuant to U.S.S.G. § 2A4.1(b)(2)[8];

and (4) denying his request for a downward departure pursuant to U.S.S.G. § 5K2.0[9].

II

---

[8]This subsection provides: "(A) If the victim sustained permanent or life-threatening bodily injury, increase by 4 levels; (B) if the victim sustained serious bodily injury, increase by 2 levels; or (C) if the degree of injury is between that specified in subdivisions (A) and (B), increase by 3 levels." U.S.S.G. § 2A4.1(b)(2).

[9]This section provides, in pertinent part:

Under 18 U.S.C. § 3553(b), the sentencing court may impose a sentence outside the range established by the applicable guidelines, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." Circumstances that may warrant departure from the guideline range pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance. The decision as to whether and to what extent departure is warranted rests with the sentencing court on a case-specific basis. Nonetheless, this subpart seeks to aid the court by identifying some of the factors that the Commission has not been able to take into account fully in formulating the guidelines. Any case may involve factors in addition to those identified that have not been given adequate consideration by the Commission. Presence of any such factor may warrant departure from the guidelines, under some circumstances, in the discretion of the sentencing court. Similarly, the court may depart from the guidelines, even though the reason for departure is taken into consideration in determining the guideline range (e.g., as a specific offense characteristic or other adjustment), if the court determines that, in light of unusual circumstances, the weight attached to that factor under the guidelines is inadequate or excessive.

U.S.S.G. § 5K2.0.

We review the district court's application of the Sentencing Guidelines de novo and its factual findings for clear error. United States v. Ortiz, 318 F.3d 1030, 1036 (11th Cir. 2003); United States v. Smith, 231 F.3d 800, 806 (11th Cir. 2000).

As we have recognized, "[t]here are two provisions of the sentencing guidelines that allow a sentencing court to divide a count into several groups for sentencing." United States v. Hersh, 297 F.3d 1233, 1248 (11th Cir. 2002), cert. denied, __ U.S. __, 123 S. Ct. 1319, 154 L. Ed. 2d 1071 (2003). These are U.S.S.G. §§ 3D1.2 & 1B1.2(d). See id. Under § 3D1.2, "a sentencing court may treat a conspiracy count as if it were several counts, each one charging conspiracy to commit one of the substantive offenses, when a defendant is convicted of conspiring to commit several substantive offenses and also convicted of committing one or more of the underlying substantive offenses." Id. (citing U.S.S.G. § 3D1.2, cmt. n.8). U.S.S.G. § 1B1.2(d) similarly provides that "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit."

In order to determine whether the district court properly divided appellant's conspiracy conviction into separate offenses pursuant to U.S.S.G. § 3D1.2, we must decide whether a conspiracy to take several hostages is a conspiracy to

9

commit several substantive "offenses" within the meaning of commentary note 8

to section 3D1.2.[10]  Notably, guideline commentary "must be given 'controlling

weight unless it is plainly erroneous or inconsistent with the regulation'" it

interprets or is contrary to the United States Constitution or federal law.  Stinson

v. United States, 508 U.S. 36, 45, 113 S. Ct. 1913, 1919, 123 L. Ed. 2d 598 (1993)

(quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)).

 Note 8 offers the following example:

> The defendant is convicted of two counts:  conspiring to
> commit offenses A, B, and C, and committing offense A.
> Treat this as if the defendant was convicted of (1)
> committing offense A; (2) conspiracy to commit offense
> A; (3) conspiracy to commit offense B; and (4)
> conspiracy to commit offense C.  Count (1) and count (2)
> are grouped together under § 3D1.2(b).

U.S.S.G. § 3D1.2, cmt. n.8.  This note goes on to explain:

> A primary consideration in this section is whether the offenses
> involve different victims.  For example, a defendant may stab three
> prison guards in a single escape attempt.  Some would argue that all
> counts arising out of a single transaction or occurrence should be

---

[10]This case is different from Hersh, where the defendant was convicted of conspiracy to travel in foreign commerce with the intent to engage in sexual acts with minors, in violation of 18 U.S.C. § 2423(b), but was not convicted of the substantive offense of traveling in foreign commerce with the intent to engage in sexual acts with minors.  See id. at 1248. ("While Hersh was convicted of a conspiracy to travel offense . . . he was not also convicted of any substantive travel offenses.").  "As a result," we held, U.S.S.G. § 3D1.2 "[did] not apply to Hersh, and he should not have been sentenced separately based on this provision."  Id.  Torrealba, by contrast, was convicted of both conspiracy to commit hostage taking and the substantive offense of hostage taking.

grouped together even when there are distinct victims. Although such a proposal was considered, it was rejected because it probably would require departure in many cases in order to capture adequately the criminal behavior. Cases involving injury to distinct victims are sufficiently comparable, whether or not the injuries are inflicted in distinct transactions, <u>so that each such count should be treated separately</u> rather than grouped together.

Id. (emphasis added).

Thus, where a conspiracy involves multiple victims, the defendant should be deemed to have conspired to commit an equal number of substantive offenses, and the conspiracy count should be divided under § 3D1.2 into that same number of distinct crimes for sentencing purposes. As the Tenth Circuit said in <u>United States v. Jose-Gonzalez</u>, a case in which the court applied the grouping rules set forth in U.S.S.G. § 3D1.2 and its application notes, "[w]hen . . . the gist of the offense is injury to persons, the offense against <u>each</u> human victim belongs in a <u>different</u> group, even when the offenses arose out of a single event. . . . [T]he Guidelines['] commitment not to group offenses having different human victims suggests that the district court's approach to grouping offenses in this case would not only be tolerated by the Guidelines but would be encouraged as a logical extrapolation of Guidelines principles." 291 F.3d 697, 707 (10th Cir. 2002) (emphasis added); <u>see also</u> <u>United States v. D'Ambrosia</u>, 313 F.3d 987, 995 (7th Cir. 2002) (Posner, J., dissenting) ("Grouping . . . is done when a defendant is convicted of multiple

11

counts so closely related that they essentially merge into a single offense; or, in the words of the guideline, when they inflict 'substantially the same harm.'  When, as in this case, the victims are different . . . , grouping [together] is improper . . . .") (quoting § 3D1.2) (other citations omitted);  United States v. Braxtonbrown-Smith, 278 F.3d 1348, 1356 (D.C. Cir. 2002) ("[T]he district court did not clearly err in grouping, for purposes of § 3D1.2(b) of the Guidelines, the fraud counts (bank, mail, and wire) separately from the money laundering and tax evasion counts given the district court's finding that there were different victims . . . ."), cert. denied, 536 U.S. 932, 122 S. Ct. 2609, 153 L. Ed. 2d 795 (2002); United States v. Bellamy, 26 Fed. Appx. 250, 261-62 (4th Cir. 2002) (holding that "multiple counts with different victims cannot be grouped under the plain language of § 3D1.2(b)").

Based on the foregoing principles, we conclude that the district court did not err in dividing Torrealba's conspiracy count into 3 separate groups under § 3D1.2 based on 3 distinct victims.  Indeed, the government could have brought 3 separate kidnaping charges against Torrealba.  See generally United States v. Burnette, 170 F.3d 567, 568 & n.1 (6th Cir. 1998).  The district court properly grouped the taking of each hostage separately for sentencing purposes.  Section 3D1.2 cmt. n.8 plainly contemplates treating the 3 kidnaping victims separately in

12

order to adequately capture the full extent of appellant's criminal behavior. Torrealba's first claim on appeal is unpersuasive, and we need not address the applicability of § 1B1.2(d) in this case.

Appellant next contends that the district court erred by applying a 6 level enhancement for the ransom demand pursuant to U.S.S.G. § 2A4.1(b)(1).[11] Specifically, he argues that the district court should not have enhanced his sentence based on the ransom demand because that demand never "was made," as, he says, it must have been for §2A4.1(b)(1) to have been implicated.

Controlling the disposition of this claim is our holding in United States v. Ferreira, 275 F.3d 1020 (11th Cir. 2001), cert. denied, 535 U.S. 1028, 122 S. Ct. 1631, 152 L. Ed. 2d 641 (2002), where Ferreira, Martinez and Caraballo advanced precisely the same argument. Importantly, Ferreira stemmed from exactly the same events that gave rise to Torrealba's prosecution, and accordingly, the pertinent portion of our holding in that case is worth reproducing at length. We said:

> The parties agree that, although a ransom letter was drafted on Martinez's computer and was printed, it was never actually delivered to Mr. Aragao. Appellants Ferreira and Martinez argue, therefore,

---

[11]This section provides: "If a ransom demand or a demand upon government was made, increase by 6 levels." U.S.S.G. § 2A4.1(b)(1).

that the enhancement was improper because § 2A4.1(b)(1) requires that a ransom demand "was made."

The district court rejected that contention, as do we. The district court held that the guideline language must be read [in light of] the application notes accompanying it. Specifically, Application Note Five to § 2A4.1 states that "[i]n the case of a conspiracy, attempt, or solicitation to kidnap, § 2X1.1 (Attempt, Solicitation or Conspiracy) requires that the court apply any adjustment that can be determined with reasonable certainty." U.S.S.G. § 2A4.1, comment. (n.5). Reading the commentary alongside the guideline language, the district court concluded that an enhancement is appropriate if it could be determined "with reasonable certainty" that a ransom demand would have been made but for the appellants' capture. The district court then found that the repeated phone calls to Mr. Aragao together with the torn letter made it "reasonably certain" that the appellants would have made a ransom demand if doing so had been feasible.

Appellants argue that the district court erred in relying on the application note in this case because the guideline language plainly requires that the ransom demand "was made." In making that argument, they cite our opinion in United States v. Chastain, 198 F.3d 1338 (11th Cir. 1999), for the proposition that, where the Guidelines provide for an enhancement based on a completed act, as evidenced by the use of the past tense, the act must actually have occurred in order for the enhancement to apply. In Chastain, the defendants attempted to use a private plane to import narcotics, but the plane crashed before the crime could be executed. During sentencing, the district court granted a two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(2), which is entitled "Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy," and permits the increase "[i]f the defendant unlawfully imported or exported a controlled substance under circumstances in which an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance . . . ." In granting the two-level enhancement, the district court relied on the words "attempt or

14

conspiracy" in the title.  Id. at 1353.  On appeal, we determined that the language required that the airplane was "used to import" and, therefore, contemplated a "completed event, an actual importation." Id.  Accordingly, we found it unnecessary to look to the title of the guideline to explain what was clear in the text and reversed because there was no completed importation. Id.

Appellants' reliance on Chastain, however, is misplaced.  In Chastain, there was no application note supporting U.S.S.G. § 2D1.1(b)(2), the provision at issue in that case.  Had there been an application note, nothing in Chastain suggests that we would not have considered it.  There is a substantial difference between the title of a guideline provision and commentary or an application note to a guideline provision. A stated purpose of the commentary is to "interpret the guideline or explain how it is to be applied."  U.S.S.G. § 1B1.7.  See also Stinson v. United States, 508 U.S. 36, 44, 113 S. Ct. 1913, 1918, 123 L. Ed. 2d 598 (1993) ("[C]ommentary explains the guidelines and provides concrete guidance as to how even unambiguous guidelines are to be applied in practice.").  There is no such stated purpose for the title, and we have held that the title of a statutory provision may be useful only when it sheds light on some ambiguous word or phrase.  Adler v. Duval County Sch. Bd., 206 F.3d 1070, 1087 (11th Cir. 1999), vac. on other grounds, 531 U.S. 801, 121 S. Ct. 31, 148 L. Ed. 2d 3 (2000), and opinion reinstated, 250 F.3d 1330 (11th Cir. 2001), cert. denied, 534 U.S. 1065, 122 S. Ct. 664, 151 L. Ed. 2d 579 (2001).  No restriction is placed on the use of the application notes and, in fact, exactly the contrary is true -- the guideline and the commentary must be "read together."  See, e.g., United States v. Pedragh, 225 F.3d 240, 244 (2d Cir. 2000) (holding that "since the commentary is part and parcel of the Sentencing Guidelines Manual and, as the Supreme Court has pointed out, is written by the same body that is charged with drafting the guidelines, the two are to be read together").  See also United States v. Gay, 240 F.3d 1222, 1232 (10th Cir. 2001).

Finally, . . . appellants' contention that a ransom note must actually have been delivered is directly contrary to the application

note's requirement that the court apply any adjustment that can be determined with "reasonable certainty." Thus, in order to adopt appellants' reading of the guideline language, we would be required to ignore the application note entirely. That, we are unwilling to do. Rather, we conclude that the district court correctly interpreted U.S.S.G. § 2A4.1(b)(1). Because the phone calls to Mr. Aragao coupled with the letter found in the North Miami house made it "reasonably certain" that the appellants would have made a ransom demand if doing so had been feasible, the district court appropriately granted the six-level enhancement.

Ferreira, 275 F.3d at 1028-30.

In this case, Torrealba relies on Chastain in arguing that we are bound to adhere to the plain meaning of § 2A4.1(b)(1) -- i.e., that the enhancement provided for by that section applies only where a ransom demand actually is delivered -- just as his co-conspirators did in Ferreira. However, we are bound by the discussion set forth above to reject that contention. Indeed, not only are we obliged to follow Ferreira as binding legal precedent -- and thus to accept its conclusion that the 6 level enhancement under § 2A4.1(b)(1) is appropriate in any case where it is reasonably certain a ransom demand would have been made -- but also, the factual circumstances in this case are literally identical to those at issue in Ferreira. Thus, the application of the 6 level enhancement under § 2A4.1(b)(1) was just as appropriate in this case as it was in Ferreira.

16

Appellant next argues that the district court erred by applying a 4 level enhancement pursuant to U.S.S.G. § 2A4.1(b)(2)(A) based on Christine's "permanent or life-threatening bodily injur[ies]." Although Torrealba concedes (as he must) that Christine suffered serious bodily injuries, and that a 2 level enhancement would have been appropriate under section 2A4.1(b)(2)(B), he contests the applicability of the larger enhancement.

The application notes to § 2A4.1 provide that "[d]efinitions of 'serious bodily injury' and 'permanent or life-threatening bodily injury' are found in the Commentary to § 1B1.1." U.S.S.G. § 2A4.1 cmt. n.1. The application notes to section 1B1.1, in turn, define these terms as follows:

> "Permanent or life-threatening bodily injury" means injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent. In the case of a kidnapping, for example, maltreatment to a life-threatening degree (e.g., by denial of food or medical care) would constitute life-threatening bodily injury.

U.S.S.G. § 1B1.1 cmt. n.1(g).

> "Serious bodily injury" means injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation. In addition, "serious bodily injury" is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or

§ 2242 or any similar offense under state law.

U.S.S.G. § 1B1.1 cmt. n.1(i).

As the Fifth Circuit has noted, "[t]he plain language of application note 1[(g)] encompasses injuries that may not be terribly severe but are permanent, hence the disjunctive: 'permanent or life- threatening injuries.'" United States v. Price, 149 F.3d 352, 354 (5ᵗʰ Cir. 1998). In this case, as we have observed supra, Christine's treating physician opined that her facial symmetry will never be the same as it was prior to the attack and that the nerve damage and scarring she suffered are likely permanent. Under these circumstances, we readily conclude that the district court did not clearly err in determining that Christine's injuries were "permanent or life-threatening," and that the imposition of a 4 level upward adjustment under section 2A4.1(b)(2)(A) consequently was appropriate.[12] See, e.g., United States v. Bogan, 267 F.3d 614, 624 (7ᵗʰ Cir. 2001) (holding that the

---

[12]Because Christine's injuries were themselves sufficient to warrant a 4 level adjustment under § 2A4.1(b)(2)(A), we need not consider whether the situation into which the conspirators placed her posed a sufficient threat to her life to warrant such an adjustment. See, e.g., United States v. Williams, 258 F.3d 669, 674 (7ᵗʰ Cir. 2001) (holding that the fact that the victim faced "life-threatening risk" was sufficient to warrant a 4 level upward adjustment) (emphasis added), cert. denied, 534 U.S. 981, 122 S. Ct. 414, 151 L. Ed. 2d 314 (2002); United States v. Morgan, 238 F.3d 1180, 1188 (9ᵗʰ Cir. 2001) ("It . . . is clear that the district court believed that [the 'life-threatening'] enhancement does not apply when the 'circumstances' themselves are life-threatening, irrespective of any other injury that the victim might have suffered. . . . We do not agree that the court's authority is so limited."), cert. denied, 534 U.S. 863, 122 S. Ct. 146, 151 L. Ed. 2d 97 (2001).

victim incurred "permanent or life-threatening injuries" where he "suffered lacerations requiring sutures, a fractured eye-socket bone, nerve damage to the left side of his face, ongoing emotional distress and migraine headaches, and the potential loss of three teeth"); United States v. Phillips, 239 F.3d 829, 848 (7th Cir. 2001) (holding that the victim's permanent facial scars constituted "permanent or life-threatening bodily injury"), cert. denied, 534 U.S. 884, 122 S. Ct. 191, 151 L. Ed. 2d 289 (2001); United States v. Chee, 173 F.3d 864 (10th Cir. 1999) (table disposition) (holding that the victim's permanent scar on her lip constituted "permanent or life-threatening bodily injury"); United States v. Jacobs, 167 F.3d 792, 797-98 (3d Cir. 1999) (holding that the victim's permanent scarring constituted "permanent or life-threatening bodily injury").

Finally, Torrealba argues that the district court erred by refusing to downwardly depart pursuant to U.S.S.G. § 5K2.0 based on the extensive physical and sexual abuse that he suffered during his childhood at the hands of Martinez, his co-conspirator and the apparent mastermind of the kidnaping plot. This contention is plainly unpersuasive. Under our caselaw, "[w]e may not review a district court's refusal to grant a downward departure unless the court mistakenly believed that it lacked the authority to grant such a departure." United States v. Hansen, 262 F.3d 1217, 1256 (11th Cir. 2001) (citing United States v. Mignott, 184

F.3d 1288, 1290 (11th Cir. 1999)), <u>cert. denied</u>, 535 U.S. 1111, 122 S. Ct. 2326, 153 L. Ed. 2d 158 (2002). In this case, the district court unambiguously recognized that it possessed the authority to downwardly depart, saying specifically that "under 5K2.0, though the Court recognizes the authority . . . for the Court to consider a downward departure, and I have very seriously thought through the presentation of the testimony by Mr. Torrealba . . . I do not find it appropriate under the facts and circumstances of this case . . . ." Simply stated, our review of appellant's fourth claim on appeal ends with this plain recognition by the district court of its authority to downwardly depart.

In short, we find none of appellant's claims persuasive, and, accordingly, we affirm.

**AFFIRMED.**